)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

SEP 29 1999

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| STANLEY MOSKOWITZ, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| versus | § | CIVIL ACTION NO. H-98-1244 |
| | § | |
| MITCHAM INDUSTRIES, ET AL., | § | |
| | § | |
| Defendants. | § | |

## O R D E R

Pending before the Court is the Mitcham Defendants' Motion to Dismiss. **(Instrument No. 37)**. Based on the parties' submissions and the applicable law, the Court finds that the Mitcham Defendants' motion should be **GRANTED in PART** and **DENIED in PART**.

### I.

Plaintiffs Stanley Moskowitz, Dean Hammond, Richard M. Maniag, Elizabeth Fairbrother Stansfeld, and Henry M. Ramseur, M.D. bring this class action suit, on behalf of all purchasers of the common stock of Mitcham Industries, Inc. ("Mitcham") between June 4, 1997 and March 26, 1998, against Defendants Mitcham, Billy F. Mitcham ("Billy Mitcham"), Roberto Rios ("Rios") (collectively referred to as the "Mitcham Defendants"), Jefferies & Company, Inc. ("Jefferies"), Rauscher Pierce Refsnes ("Rauscher"), Gaines,

CMsPDF - www.texsta.com

)

Berland Inc. ("Gaines").[1]  Plaintiffs allege that Defendants misled them and "the investing

public by issuing materially false financial statements and disseminating materially false and

misleading statements about Mitcham's business operations." (Consolidated Amended Class

Action Complaint, Instrument No. 27, ¶ 1).  As a result, Plaintiffs continue, Defendants,

through their misconduct, "artificially inflate[d] the price of Mitcham's common stock

throughout the [c]lass [p]eriod" in violation of federal securities laws.  (*Id.*).

According to Plaintiffs' allegations, Mitcham specializes in the leasing of 3-D seismic

equipment to the oil and gas exploration industry.  (*Id.* ¶ 21).  In particular, Mitcham "leases

and sells geophysical and other equipment used primarily by seismic service companies in

performing seismic data acquisition surveys on land and in transition zones, such as marshes

and shallow water."  (*Id.*).

Mitcham allegedly indicated that the demand for leased seismic services had increased

significantly over the past several years due to technological advances.  (*Id.* ¶ 21).  As a

consequence, Mitcham purportedly maintained that from January 31, 1995 through October

31, 1997, the company's seismic equipment lease pool grew from approximately $4.98 million

to $37.4 million.  (*Id.*).

In December of 1996, Grant Geophysical, Inc. ("Grant"), one of Mitcham's largest

customers, filed for bankruptcy under Chapter 11.  (*Id.* ¶ 22).  As a result, Mitcham

supposedly "increased its allowance for trade accounts receivable from $615,000 on October

---

[1]Billy Mitcham was the Chairman, President, and Chief Executive Officer of Mitcham. Rios was the Vice President-Financial and Chief Financial Officer of Mitcham.  Jefferies & Company, Inc., Rauscher Pierce Refsnes, and Gaines, Berland Inc. are "investment banking houses which specialize . . . in underwriting public offerings of securities and making markets in the stock of public companies."  (Instrument No. 27, ¶ 20).

2

)

31, 1996 to $1.5 million on December 31, 1996[.]"  (*Id.*).   According to Plaintiffs, the Mitcham Defendants claimed that this amount "would fully reserve all amounts due from Grant and [would] provide for any potential loss associated with . . . [Mitcham's] remaining trade accounts receivable."  (*Id.*).

On January 17, 1997, Mitcham issued a press release announcing that the company "was increasing its doubtful account allowance by $500,000 to provide for Grant's bankruptcy filing the preceding month."  (*Id.* ¶ 26).   Also, on this date, Mitcham issued another press release announcing that the company had filed a Form S-1 Registration Statement on January 17, 1997 (the "January 1997 Registration Statement") with the Securities and Exchange Commission ("SEC") for a secondary offering of 3 million shares of Mitcham common stock, of which 50,000 shares were being sold by shareholders.  (*Id.* ¶ 23).   In the January 1997 Registration Statement, the stated objective of the company was purportedly to pursue "a strategy of growth in its seismic equipment leasing business . . . [because the] potential for growth in new and used seismic equipment sales [wa]s not believed to be significant."  (*Id.* ¶ 24).   According to Plaintiffs, these statements that were included in the January 1997 Registration Statement "were intended to convince the investing public that, leasing, as opposed to [the] sale[], of equipment offered the greater potential for Mitcham's business growth, and that the [c]ompany would not rely upon sales for financial stability." (*Id.* ¶ 25).

Defendants then completed the secondary offering on March 5, 1997.  (*Id.* ¶ 27). Defendants sold 3,450,000 shares of common stock, of which 500,000 shares were allegedly sold by insiders.  (*Id.*).

3

CM-PDF - www.fasoo.com

)

Later, on March 12, 1997, the Mitcham Defendants issued another press release in which Billy Mitcham announced that the total revenues for the company had increased nearly 101.5% in fiscal year 1996. (*Id.* ¶ 28). Billy Mitcham also purportedly stated that the company planned "to diversify even further and grow . . . [its] lease pool." (*Id.*). Again, in its annual report, Form 10-K, filed with the SEC on April 30, 1997 ("1996 Form 10-K"), the company reiterated its plan to grow in its seismic equipment leasing business. (*Id.* ¶ 29). In addition, in the Form 10-K, Mitcham reported that "[d]uring 1996, the [c]ompany increased its allowance for trade accounts receivable to $1,500,00, which amount was intended to provide for any potential loss associated with Grant and the [c]ompany's remaining trade accounts receivable." (*Id.* ¶ 31). Plaintiffs also claim that the 1996 Form 10-K "represented to the investing public that the [c]ompany had made adequate provisions for doubtful accounts." (*Id.* ¶ 32).

In summary, by the beginning of the class period, Plaintiffs maintain that the Mitcham Defendants led the market to believe that (1) the company's growth potential existed in equipment leasing revenue, not sales revenue, and (2) the company's allowance for doubtful accounts was sufficient. (*Id.* ¶ 34).

Then, on June 4, 1997, Mitcham issued a press release reporting that the company's revenues included $4.1 million in lease revenues and $1.4 million in sales revenues. (*Id.* ¶ 35). The press release also stated that the company's "investment in expanding . . . [its] seismic lease pool [wa]s progressing smoothly[.]" (*Id.*). Plaintiffs insist that the statements included in the press release were false in misleading. (*Id.* ¶ 36).

4

)

According to Plaintiffs, it was actually becoming harder for Mitcham to obtain new lease contracts upon the termination of existing lease terms and that the company was, in reality, relying more on the significantly lower margin sales revenue, not the higher margin lease revenues. (*Id.*). In addition, Plaintiffs continue, Mitcham's reliance on sales revenues, rather than lease revenues, heightened the company's earnings volatility. (*Id.*). Furthermore, Plaintiffs maintain that the company's financial statements prematurely recognized revenues from operating lease transactions, contrary to Generally Accepted Accounting Procedures ("GAAP"). (*Id.*).

Later, on June 12, 1997, Mitcham's Form 10-Q, the quarterly report that was filed with the SEC for the company's first fiscal quarter ending April 30, 1997, reported that the company's leasing services had generated revenues of $4,116,000, an increase of 128.2%. (*Id.* ¶ 37). This Form 10-Q also emphasized the company's focus on expanding its leasing business and addressed the company's provision for doubtful accounts expense, which had increased from $140,000 to $289,000 in the first quarter of the previous year. (*Id.* ¶¶ 38-39). Plaintiffs complain that the information in the Form 10-Q materially misrepresented that the company "did not consider equipment sales to be an area of revenue upon which . . . [it] relied for growth or financial stability and that the statements "did not adequately reflect Mitcham's true financial position." (*Id.* ¶¶ 38 and 41).

On September 3, 1997, another press release was issued announcing that, for the second quarter ending on July 31, 1997, Mitcham's lease revenues totaled $2.7 million and its sales revenues totaled $8.2 million. (*Id.* ¶ 42). Again, in this press release, Billy Mitcham expressed his optimism about the company's growth and its continued plan to expand the size

5

and scope of the lease fleet. (*Id.*). In particular, Billy Mitcham stated that many of Mitcham's leasing customers exercised their option to purchase equipment under lease at the end of their lease contract. (*Id.*).

Mitcham's Form 10-Q for the second quarter ending on July 31, 1997, filed with the SEC on September 10, 1997, contained the information that was reported in the September 3, 1997 press release and indicated that $2.4 million was now due from Grant given the company's $1.2 million sale to Grant of seismic equipment that Grant was previously leasing. (*Id.* ¶¶ 45 and 47). The Form 10-Q also reported that Mitcham's provision for doubtful accounts expense increased to $560,000 because of the additional provisions for the allowance account in connection with the bankruptcy filing of Grant. (*Id.* ¶ 49). Plaintiffs contend that the Mitcham Defendants' statements regarding Mitcham's doubtful accounts allowance and expense were materially false and misleading because they did not adequately reflect the company's true financial position. (*Id.* ¶ 51).

Between September 12, 1997 and September 18, 1997, Billy Mitcham allegedly sold on the open market 135,000 shares of his personal holdings, realizing proceeds of $2,591,950. (*Id.* ¶ 52). Then, on September 16, 1997, Rios purportedly sold on the open market 10,350 shares of Mitcham stock, realizing a gain of at least $200,583. (*Id.* ¶ 53).

Thereafter, on November 19, 1997, Mitcham announced that the company had filed a Registration Statement ("November 1997 Registration Statement") with the SEC for another secondary offering of 1,850,000 shares of common stock, of which 50,000 were to be sold by selling shareholders. (*Id.* ¶ 55). The offering was to become effective on December 17, 1997. The company also disclosed that Defendants Jefferies, Rauscher, and

6

)

Gaines were co-lead underwriters for the offering.  (*Id.*).  Furthermore, Mitcham indicated

that the proceeds from the offering would be used to purchase additional seismic equipment

for the company's lease pool and for general corporate purposes.  (*Id.*).

On November 25, 1997, Mitcham filed with the SEC a Form 10-Q to amend its filing

for the second fiscal quarter that ended on July 31, 1997.  (*Id.* ¶ 56).  The amended Form 10-

Q reported that the company's total revenues had decreased by $261,000 and that its doubtful

accounts expense had decreased by exactly $261,000.  (*Id.* ¶ 57).

Then, on November 26, 1997, Mitcham filed with the SEC the company's Form 10-Q

for the third quarter ending on October 31, 1997.  (*Id.* ¶ 61).  In this report, Mitcham stated

that its net income had increased to $1,973,000 and earnings per share had increased to

$0.25.  (*Id.*).  In addition, the report indicated that Mitcham had received $1.2 million in

payments from Grant and that the company expected to collect one-half of pre-bankruptcy

petition claims totaling approximately $755,000.  (*Id.* ¶ 64).

Mitcham then issued a Registration Statement and Prospectus (the "Prospectus") for

the offering to become effective on December 17, 1997.  (*Id.* ¶ 66).  According to Plaintiffs,

the Prospectus misrepresented that the leasing of seismic equipment, as opposed to the selling

of such equipment, would lead to financial growth for the company.  (*Id.*).  Plaintiffs also

contend that the Defendants' statements and financial disclosures regarding the adequacy of

Mitcham's doubtful accounts allowance and expense did not adequately reflect the company's

true financial position.  (*Id.* ¶ 74).

On December 1, 1997, Rios announced that Mitcham's leasing services for the third

quarter ending on October 31, 1997, increased to $4.3 million and its sales of seismic

equipment increased to $5.8 million. (*Id.* ¶ 75). Allegedly, the increase in sales revenues was attributed to the exercise of lease purchase option contracts. (*Id.*).

On December 18, 1997, Mitcham issued a press release stating that the underwriting group had priced a public offering of 1,820,000 shares of Mitcham common stock at $19.00 per share. (*Id.* ¶ 76). "According to the press release, the offering was expected to generate net proceeds of approximately $32 million." (*Id.*). Also, on December 18, 1997, Defendant Gaines issued an analyst report that upgraded Mitcham's rating to a "strong buy." (*Id.* ¶ 77). Defendant Jefferies "initiated coverage of Mitcham with a '[b]uy' rating[.]" (*Id.* ¶ 78). Plaintiffs maintain that these ratings were based on representations provided by the Mitcham Defendants. (*Id.* ¶¶ 77-78).

Later, on March 26, 1998, Mitcham informed the investing public that the company's projected growth would not meet analysts' estimates for the fourth quarter or the year. (*Id.* ¶ 80). Mitcham gave specific factors that contributed to the shortfall, including customers not exercising purchase options on leased equipment as anticipated and a possible increase in allowance for doubtful accounts receivable related to certain international customers. (*Id.*). The next day, in the March 27, 1998 edition of *The Oil Daily*, Rios allegedly further attributed the shortfall to the collapse of Mitcham's significant pending equipment sales agreements. (*Id.* ¶ 81). As a result of these disclosure, Mitcham's stock purportedly dropped to $13.00 per share on March 26, 1998. (*Id.* ¶ 83).

Consequently, Plaintiffs filed this suit on April 23, 1998, against the Mitcham Defendants, Jefferies, Rauscher, and Gaines. Plaintiffs assert violations of Sections 11 and 12(a) of the Securities Act of 1933 (the "Securities Act") against all of the defendants, 15

U.S.C. § 77k and 15 U.S.C. § 77l, respectively.  In addition, Plaintiffs claim that the Mitcham

Defendants violated Section 10(b) and Section 20(a) of the Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78j(b) and 15 U.S.C. § 78t(a), respectively, SEC Rule 10b-5,

17 C.F.R. § 240.10b-5 (1988), and Section 15 of the Securities Act, 15 U.S.C. § 77o.  In

general, Plaintiffs maintain that the statements made by Defendants during the class period

were materially false and misleading and "made for the purpose of artificially inflating the

price of Mitcham stock so that [D]efendants could sell their shares of stock and realize

artificially high gains."  (*Id.* ¶ 79).

## II.

On January 15, 1999, the Mitcham Defendants filed a Motion to Dismiss Plaintiffs'

Complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure

and under the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (Instrument

No. 37).  The Mitcham Defendants raise several arguments in support of their motion.  With

respect to Plaintiffs' claims under Section 10(b) and Rule 10b-5, the Mitcham Defendants

argue that Plaintiffs fail to demonstrate that any of their statements were false when made by

the Mitcham Defendants.  In addition, they contend that Plaintiffs' allegations based upon

"information and belief" do not satisfy the strict pleading requirements of the PSLRA.

Furthermore, the Mitcham Defendants maintain that none of the alleged misstatements are

actionable as a matter of law because they either are statements made outside the class period,

are accurate statements of historical fact, or are puffing statements concerning product

demand, growth and future success of the company.

9

The Mitcham Defendants also assert that Plaintiffs' accounting fraud claim has not been alleged with sufficient particularity.  In particular, the Mitcham Defendants contend that Plaintiffs have not demonstrated fraud due to inadequate reserves and have not alleged any facts establishing fraud due to improper revenue recognition.   Moreover, the Mitcham Defendants insist that their purported failure to comply with GAAP does not constitute a violation of federal securities laws and that they cannot be held liable for statements made by their analysts.

Furthermore, the Mitcham Defendants argue that Plaintiffs' allegations do not satisfy the heightened pleading standards for scienter under the PSLRA.  In addition, they maintain that the PSLRA's Safe Harbor and Bespeaks-Caution doctrines protect them from liability for any forward-looking statement that were made by them.  The Mitcham Defendants also complain that Plaintiffs cannot  establish that the alleged statements caused the loss for which Plaintiffs seek recovery.

As for Plaintiffs' causes of action under Sections 11 and 12(a), the Mitcham Defendants emphasize that, with the exception of Stanley Moskowitz, all of the other plaintiffs cannot establish that they purchased their stock in the secondary offering, as required to assert these claims.  The Mitcham Defendants also assert that Plaintiffs' Section 12(a) action must fail because none of the defendants was a seller of Mitcham stock.  Lastly, they contend that Defendants Billy Mitcham's and Rios's status at Mitcham is insufficient to establish control person liability under Sections 20(a) and 15.

In response, Plaintiffs maintain that Mitcham's motion should be denied because they have adequately pled their causes under Rule 12(b)(6) and with sufficient particularity under

Rule 9(b) and the PSLRA. First, Plaintiffs insist that they identified the Mitcham Defendants' statements and explained how they were false and misleading when made by them. In particular, Plaintiffs explain that they have sufficiently alleged the time, place, content, and speaker of each misrepresentation. In addition, Plaintiffs maintain that none of their allegations have been pled on "information and belief." Furthermore, Plaintiffs argue that the Mitcham Defendants' false statements were not accurate historical facts and that the Mitcham Defendants are liable for their optimistic statements. Plaintiffs also contend that their accounting fraud claims based on improper revenue recognition and inadequate allowance for doubtful accounts are actionable. Moreover, Plaintiffs explain that the Mitcham Defendants are liable for their false statements made to their analysts regardless of whether they adopted or approved those statements.

With respect to their pleadings under the PSLRA, Plaintiffs maintain that the Safe Harbor and Bespeaks-Caution doctrines are inapplicable. Plaintiffs also claim that their allegations sufficiently establish that the Mitcham Defendants caused their losses. Furthermore, Plaintiffs insist that they have alleged motive and opportunity as well as the Mitcham Defendants' recklessness and conscious action, as required under the PSLRA.

As for their claims under Sections 11 and 12(a), Plaintiffs argue that they have standing to assert such claims since they purchased shares directly in the offering. Moreover, Plaintiffs maintain that the Mitcham Defendants are statutory sellers because "Mitcham was the issuer of the securities, Billy Mitcham personally sold 20,000 shares in the [o]ffering, and both Billy Mitcham and Rios signed the misleading . . . [Prospectus]." (The Mitcham Defendants' Reply, Instrument No. 45, at 23). Lastly, Plaintiffs assert that Billy Mitcham and

11

Rios clearly had the power to control Mitcham's publicly disseminated information, as required to establish control person liability under Sections 20(a) and 15.

## III.

Rule 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief may be granted." Such dismissals, however, are rare, *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir. 1986), and only granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957). Dismissal can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Vines v. City of Dallas, Texas*, 851 F. Supp. 254, 259 (N.D. Tex. 1994), *aff'd*, 52 F.3d 1067 (5th Cir. 1995).

In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiff's complaint. *Gargiul v. Tompkins*, 704 F.2d 661, 663 (2d Cir. 1983), *vacated on other grounds*, 465 U.S. 1016 (1984); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983). In addition, all reasonable inferences are to be drawn in favor of the plaintiff's claims. *Id*. "To qualify for dismissal under Rule 12(b)(6), a complaint must on its face show a bar to relief." *Clark*, 794 F.2d at 970.

"Securities fraud allegations are subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 934 (N.D. Tex. 1995). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the

12

circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b).  The rule imposes a standard of pleading higher than the notice pleading requirement of Rule 8(a) of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." The purposes of Rule 9(b) include providing the other party with fair notice of the claim, safeguarding a party's reputation, and precluding litigants from filing baseless charges of fraud in an attempt to discover unknown wrongs. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) (addressing Rule 9(b) in securities fraud context) (citations and quotations omitted).

In the context of securities fraud allegations, the Fifth Circuit requires allegations of the particular time, place, and content of the false misrepresentations, as well as identification of the person making the alleged misrepresentation and what was obtained. *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994); *Coates*, 26 F. Supp.2d at 914.  "What constitutes 'particularity' will necessarily differ with the facts of each case . . . ." *Shushany*, 992 F.2d at 521.

The pleading-with-particularity requirement under Rule 9(b) is further defined by the PSLRA.  *Coates*, 26 F. Supp.2d at 914.  "'[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Id.* at 914 (quoting 15 U.S.C. § 78u-4(b)(1)).  "The complaint must also specify each statement alleged to have been misleading and the reason why it is misleading." *Id.* at 917.  In addition, a plaintiff must "distinguish among the

13

)

defendants, attributing each allegedly fraudulent statement to a particular defendant or defendants." *Robertson v. Strassner*, 32 F. Supp.2d 443, 446 (S.D. Tex. 1998).

Furthermore, a plaintiff "must satisfy the PSLRA's requirement for pleading scienter." *Sushany*, 26 F. Supp.2d at 915. "Scienter is a 'mental state embracing intent to deceive, manipulate or defraud.'" *Robertson*, 32 F. Supp.2d at 446. "The PSLRA requires that 'the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 915 (quoting 15 U.S.C. 78u-4(b)(1)). A plaintiff "may meet the heightened pleading requirements of Rule 9(b) and the PSLRA . . . by 'alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating [the] [d]efendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent.'" *Robertson*, 32 F. Supp.2d at 447 (quoting *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp.2d 618, 623 (N.D. Tex. 1998)).

"A dismissal for failure to state fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." *Sushany*, 26 F. Supp. at 520.

14

)

## IV.

With respect to their claims under Section 10(b) and Rule 10b-5, Plaintiffs allege the following:

> [The Mitcham Defendants are] liable for (i) making false statements, or (ii) for failing to disclose adverse facts while selling Mitcham stock, and (iii) for participating in a fraudulent scheme which permitted defendants to sell or dispose of over 2.06 million shares of Mitcham stock [for an artificially inflated price of over $36 million.]

(Consolidated Amended Class Action Complaint, Instrument No. 27, ¶ 115).

"To survive a Rule 12(b)(6) dismissal, plaintiffs must allege facts entitling them to relief for their substantive causes of action." *Coates v. Heartland Wireless Communications*, 26 F. Supp.2d 910, 914 (N.D. Tex. 1998). Section 10(b) provides that it is unlawful for any person

> [t]o use or employ, in connection with the purchase or sale of any security . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, in relevant part, states that it is unlawful for any person, directly or indirectly,

> [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish a federal securities fraud claim under Section 10(b) and Rule 10b-5, the plaintiffs must show: "'(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury.'" *Sushany*, 992 F.2d at 520-21 (quoting *Cyrak v. Lemon*, 919 F.2d 320, 325 (5th Cir. 1990)).

15

## A.

First, the Mitcham Defendants challenge the sufficiency of Plaintiffs' allegations of false statements in support of their claims under Section 10(b) and Rule 10b-5. For example, the Mitcham Defendants argue that "Plaintiffs fail to plead any facts showing that . . . [their] public statements concerning the [c]ompany's financial results, record revenue growth and overall growth strategy . . . were false or misleading in the light of the information known *at the time they made the statements*." (The Mitcham Defendants' Memo, Instrument No. 38, at 6). In particular, the Mitcham Defendants contend that "plaintiffs make no attempt to connect each individual alleged misstatement to specific problems or information that the Mitcham Defendants *knew at that time*[.]" (*Id.*). The Mitcham Defendants also maintain that Plaintiffs fail to "identify the time, place, and nature of the allegedly fraudulent activity on a statement by statement basis." (*Id.* at 6-7).

The Court finds that the facts alleged by the Plaintiffs as summarized above sufficiently support their claims under Section 10(b) and Rule 10b-5 and satisfy the pleading requirements of Rule 9(b) and the PSLRA. The Consolidated Amended Class Action Complaint ("Complaint"), which spans fifty-nine pages, alleges that the Mitcham Defendants made misrepresentations on dates certain relating to the following: (1) the source or cause of Mitcham's revenue growth; (2) the amount of the company's revenues and whether the company deferred any revenue; (3) Mitcham's growth strategy in the company's seismic equipment leasing business; (4) Mitcham's reliance on sales revenues; (5) Mitcham's doubtful accounts allowance and expense; and (6) the company's trade account receivables.

16

(Consolidated Amended Class Action Complaint, Instrument No. 27, ¶¶ 35, 37-40, 42, 45-50, 54-58, 61-64, 66-73, 75-78, 84-98).

According to Plaintiffs, the Mitcham Defendants' misrepresentations stem from the following sources: (1) a press release issued on June 4, 1997; (2) Mitcham's Form 10-Q for the company's first fiscal quarter ending April 30, 1997, filed with the SEC on June 12, 1997; (3) September 3, 1997 press release; (4) Mitcham's Form 10-Q for the second quarter ending on July 31, 1997, filed with the SEC on September 10, 1997; (5) a statement made by Billy Mitcham, apparently, on October 23, 1997; (6) November 19, 1997 press release; (7) Mitcham's Amended Form 10-Q filed with the SEC on November 25, 1997; (8) Mitcham's For 10-Q for the third quarter ending on October 31, 1997, filed with the SEC on November 26, 1997; (9) Mitcham's Registration Statement and Prospectus for the offering which was effective on December 17, 1997; (10) December 1, 1997 press release; (11) December 18, 1997 press release; (12) December 18, 1997 analyst report by Defendant Gaines; (13) December 22, 1997 coverage by Defendant Jefferies; and (14) January 31, 1998 Form 10-K. (*Id.*).

Similarly, the material omissions which Plaintiffs claim the Mitcham Defendants made concern the following alleged facts: (1) that it was becoming harder for Mitcham to obtain new lease contracts upon the termination of existing lease terms; (2) that the company relied more on lower margin sales; (3) that the company's financial growth depended on the sale of seismic equipment; (4) that Mitcham's reliance on sales revenues heightened the company's earnings volatility; (5) that the company's financial statements prematurely recognized lease transactions and bad debt expense; (6) that all potential losses in trade accounts receivable as

of the end of first quarter had been addressed; (7) that the company's allowance for doubtful account and doubtful accounts expense were insufficient; (8) that Mitcham overstated revenues by $261,000 in the Form 10-Q for the second quarter; and (9) that the company experienced a decrease in the exercise of purchase options. (*Id.* ¶¶ 36, 38-39, 41, 43, 45, 51, 59-60, 65-66, 70, 74-75).

Plaintiffs have stated—by time, place, content, and speaker—the statements which they allege were false and misleading. (*See id.* ¶¶ 35, 37-40, 42, 45-50, 54-58, 61-64, 66-73, 75-78, 84-98). Plaintiffs have also explained factually why they believe the statements were false. (*See id.* ¶¶ 36, 38-39, 41, 43, 45, 51, 55, 59, 60, 65-66, 69-70, 74-75, 89-96). Furthermore, Plaintiffs have identified the particular defendant who made the allegedly false statement or have identified the statement as one that appeared in a document disseminated by Mitcham or the underwriters. (*See id.* ¶¶ 35, 37-40, 42, 45-50, 54-58, 61-64, 66-73, 75-78, 84-98). Moreover, "[w]here a particular defendant is quoted in any of the above-listed sources, Plaintiffs supply the name of the speaker and the specific quote at issue. Likewise, when an allegation concerns a corporate announcement, Plaintiffs quote the statements alleged to be misleading." *Zuckerman*, 4 F. Supp. at 624.

Next, the Mitcham Defendants argue that Plaintiffs fail to state with particularity all facts on which their "information and belief" is formed. Contrary to the Mitcham Defendants' position, Plaintiffs insist that their allegations are based on "investigation by counsel," not on "information and belief," and as such, the PSLRA requirements do not apply. The Court need not decide this issue, however, because it finds that, by clearly stating the facts on which they

base their fraud claim, they have satisfied the PSLRA's requirements. The Court has, to a certain extent, already addressed this argument above.

In their Complaint, Plaintiffs state that they have alleged the facts

based upon personal knowledge as to themselves and their acts, and as well as to all other matters, *upon the investigation undertaken by counsel,* which included, *inter alia,* the review and analysis of public filings of Mitcham with the SEC, press releases, securities analysts' reports, news articles and discussions with consultants."

(Complaint, Instrument No. 27, at 58) (emphasis added). As for each allegedly false and misleading statement, Plaintiffs clearly identify who made the misrepresentation, the content of the misrepresentation, the date they were made, and where they were reported. Furthermore, Plaintiffs "provide a detailed chronology of events and, in doing so, allege why the statements or omissions were material misrepresentations at the time they were made." *Zuckerman,* 4 F. Supp.2d at 626. Moreover, when appropriate, Plaintiffs "name each individual defendant whom they allege had a hand in the misrepresentation." *Id.* Therefore, the Court finds that Plaintiffs' allegations satisfy the heightened pleadings standards of the PSLRA for allegations based upon "information and belief." *See id.*

## B.

The Mitcham Defendants then discuss three reasons as to why certain alleged misstatements are not actionable as a matter of law. First, they contend that those statements that fall outside the class period are *per se* not actionable. The Court agrees. "A defendant . . . is liable only for those statements made during the class period." *In re International Business Machines Corporate Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998). The class period defines the time during which Defendants' alleged fraud was alive in the market. Plaintiffs state that the class period is from June 4, 1997, to March 26, 1998. (Complaint, Instrument

19

No. 27, ¶ 1).  Consequently, those allegedly false and misleading statements that occurred before June 4, 1997, or after March 26, 1998, are not actionable as a matter of law.  According to Plaintiffs' responsive brief, they only seek to recover for misstatements that occurred during the class period.  (*See id.* ¶¶ 35, 37-40, 42, 45-50, 54-58, 61-64, 66-73, 75-78, 84-98; Plaintiffs' Response, Instrument No. 45, at 8 n.10).

Second, the Mitcham Defendants argue that most of Plaintiffs' allegations concern non-actionable statements of historical fact.  In particular, the Mitcham Defendants continue, "Plaintiffs identify certain [c]ompany press releases, quarterly reports, and public filings disclosing historical quarterly or yearly financial results, but they do not and cannot allege that these historical facts are incorrect, incomplete or otherwise invalid."  (The Mitcham Defendants' Memo, Instrument No. 38, at 8).  The Mitcham Defendants rely on *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369 (N.D. Cal. 1995), as support for this proposition.

In *In re Cypress*, the court analyzed Cypress's statements concerning the company's third quarter results.  891 F. Supp. at 1379.  In particular, in a December 1991 letter, the company's chief executive officer gave the following report:

> Our gross profit margin of 56.9% of revenues decreased one-half percentage point from the preceding quarter due to lower sales generated by the relatively high-margin Ross technology and Aspen semiconductor business units.  Our new Minnesota continues its excellent performance and already accounts for 6% of Cypress['s] revenues . . . . Higher yields in our Texas and Minnesota plant contributed to higher output.

*Id.*  The court held that this statement was not actionable since the chief executive officer "gave an accurate factual account of Cypress' third quarter."  *Id.*  Moreover, the court held

that "these statements of historic fact did not convey a misleading impression by implying similar success for the future." *Id.*

Unlike the situation in *In re Cypress*, Plaintiffs, in this case, maintain that the Mitcham Defendants falsified the financial results (revenue and earnings) reported in either Mitcham's SEC filings or press releases. (Plaintiffs' Response, Instrument No. 45, at 8).
The Court, therefore, finds *In re Cypress* to be inapplicable to this case. As such, the Mitcham Defendants fail to show that most of Plaintiffs' allegations contained in paragraphs 35, 37, 40, 46-49, 56-58, 61-63, 71-73, 75 are non-actionable historical facts.

In addition to the challenges discussed above, the Mitcham Defendants contend that those statements that express optimism about Mitcham's prospects "are not actionable because they are exactly the sort of puffery upon which investors may not rely as a matter of law." (The Mitcham Defendants' Memo, Instrument No. 38, at 9). In particular, the Mitcham Defendants challenge those statements contained in paragraphs 38, 42, 45, 55, 66, and 70. Plaintiffs maintain that these statements are not mere puffing, but rather actionable false statements made for the purpose of misleading investors.

Soft, "puffing" statements, such as "the future of the [c]ompany looks bright," are not worded as guarantees and as such, are not actionable under the federal securities laws. *In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 897 (S.D. Tex. 1995). Mere puffing "does not rise to the level of an actionable misrepresentation because no reasonable person would have been mislead by it." *In re Storage Technology Corp. Sec. Litig.*, 804 F. Supp. 1368, 1372 (D. Colo. 1992).

)

The Court finds that the challenged statements in these paragraphs do not constitute mere puffing. Generally, these statements discuss Mitcham's decision to pursue a growth strategy in the seismic equipment leasing business. They are not similar to the statements held by other courts as soft "puffing." *See In re Browning*, 876 F. Supp. at 897 (holding that statements that "the future of the [c]ompany looks good" or that "we are poised for the next round of growth" constitutes soft puffing); *In re Storage*, 804 F. Supp. at 1372 (concluding that statement that the company "is proud of Iceberg and opined that it would be another blowout winner" is mere puffing). Consequently, the Court declines to hold as a matter of law that the statements contained in paragraphs 38, 42, 45, 55, 66, and 70 are not actionable and should be dismissed as mere puffing.

## C.

With respect to predictive or forward-looking statements, namely those contained in paragraphs 38, 42, and 45, the Mitcham Defendants contend that they are protected under the PSLRA's Safe Harbor provisions and by the Bespeaks Caution doctrine.

## 1.

Under the PSLRA's Safe Harbor provisions, a person shall not be liable for any forward-looking statement if:

> (A) . . .
>> (i) [it is] identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>> (ii) [it is] immaterial; or
> (B) the plaintiff fails to prove that the forward looking statement—
>> (i) if made by a natural person, was *made with actual knowledge by that person that the statement was false or misleading*; or

22

)

    (ii) if made by a business entity; was—

            (I) made by or with the approval of an executive officer of that entity; and

            (II) made or approved by such officer *with actual knowledge* by that officer that the statement *was false or misleading*.

15 U.S.C. 78u-5(c)(1)(A) (emphasis added).  Thus, "[e]ven if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading'" *Harris v. Ivax Corp.*, No. 98-4818, 1999 WL 542319, *2 (11th Cir. July 27, 1999).

    The Mitcham Defendants emphasize that Plaintiffs fail to plead a single fact demonstrating that any Mitcham Defendant had actual knowledge that a forward-looking statement contained in paragraphs 38, 42, and 45 was false when made by them.  Conversely, Plaintiffs assert that they have set forth facts that the Mitcham Defendants actually knew that these statements were "false and misleading when made and could not be achieved." (Plaintiffs' Response, Instrument No. 45, at 15).  In support of this proposition, Plaintiffs cite paragraphs 43 and 45 of their Complaint.

    However, paragraphs 43 and 45 of their Complaint do not show that the Mitcham Defendants *actually knew* that the challenged statements were false when made.  They simply explain Plaintiffs' position as to why these statements were false and misleading and allege that the Mitcham Defendants knew that they were false and misleading.  The Court need not "accept conclusory allegations and unwarranted deductions as true on a motion to dismiss." *Coates*, 26 F. Supp.2d at 915.  The Court, therefore, **GRANTS** the Mitcham Defendants' motion with respect to those statements contained in paragraphs 38, 42, and 45, as being protected by the PSLRA's Safe Harbor provisions.

)

**2.**

Having determined that these statements in paragraphs 38, 42, and 45 are protected under the PSLRA's Safe Harbor provisions, the Court need not address whether they are protected under the Bespeaks Caution doctrine.  The Court will, however, address whether the Mitcham's prospectus is protected under this doctrine.

The Mitcham Defendants specifically assert that the prospectus contained three pages of risk disclosures and cautionary language and, as such, the forward-looking statements in the Prospectus are protected by the Bespeaks Caution doctrine.

A forecast or prediction

> may be regarded as a "fact" within the meaning of the securities laws if: (1) the speaker did not genuinely believe the statement was true; (2) there was no reasonable basis for the speaker to believe the statement was true; and (3) the speaker was aware of an undisclosed fact tending seriously to undermine the accuracy of the statement.

*In re Browning*, 876 F. Supp. at 878.  "'Under the 'bespeaks caution' doctrine, if a defendant adds a cautionary statement to the predictive statement, then the statements may not be actionable as a matter of law.'" *Robertson*, 32 F. Supp. at 499 (quoting Zuckerman, 4 F. Supp. at 624).[2]  Furthermore, "the language bespeaking caution . . . [must] relate directly to

---

[2] "A court must determine whether a challenged statement is a forecast or prediction, as opposed to a 'soft' statement that generally lacks materiality because 'the market price of a share is not inflated by vague statements predicting growth.'" *In re Browning*, 876 F. Supp. at 878 (quoting *Raab v. general Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993)). "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993). "In determining whether a predictive statement 'suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis,' a court must examine the context in which the statement [wa]s made." *In re Browning*, 876 F. Supp. at 878.

)

that by which plaintiffs claim to have been misled." *Kline v. First Western Government Sec.,*

*Inc.*, 24 F.3d 480, 489 (3d Cir. 1994).

According to the Mitcham Defendants, the "disclosures [in the prospectus] discussed

the [c]ompany's dependence on a few clients, probable fluctuations in gas and oil prices

affecting demand, and the fact that clients are under no obligation to renew their lease." (The

Mitcham Defendants' Memo, Instrument No. 38, at 16).   Plaintiffs maintain that the

prospectus "failed to disclose that leasing was a declining business and that Mitcham's financial

results were falsely reported." (Plaintiffs' Response, Instrument No. 45, at 16 n.23).

"A motion to dismiss for failure to state a claim will succeed only when the documents

containing defendants' challenged statements include 'enough cautionary language or risk

disclosure,' . . . that 'reasonable minds' could not disagree that the challenged statements were

not misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (quoting *In re*

*Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).  Based on the record, the

Court does not believe that the Plaintiffs are unable to state a claim upon which relief can be

granted with respect to the issue of whether the prospectus contains sufficient cautionary

language or risk disclosure relating to those misrepresentations raised by Plaintiffs.

### C.

Next, the Mitcham Defendants' claim that Plaintiffs' allegations do not raise the

necessary strong inference of fraudulent intent.   In particular, they insist that Mitcham's

secondary offering and stock sales by Billy Mitcham and Rios are insufficient to establish

motive.

In their complaint, Plaintiffs state the following:

25

117.    The Individual Defendants also had the *motive* to commit and participate in the fraud.  As owners of significant amounts of stock, they were in a position to realize significant gains through the liquidation of their investments.  As demonstrated by their sales of hundreds of thousands of Mitcham shares, both privately and through the Offering, the Individual Defendants readily and accessibly capitalized upon the artificially inflated stock price, and generated for themselves millions of dollars in proceeds.  The Individual Defendants also were motivated to conceal the serious problems Mitcham was having with its revenue in an attempt to maintain Mitcham's competitive position in its markets.

(Complaint, Instrument No. 27, ¶ 117) (emphasis added).[3]

As mentioned, a plaintiff "may meet the heightened pleading requirements of Rule 9(b) and the PSLRA . . . by 'alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating [the] [d]efendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent.'"  *Robertson*, 32 F. Supp.2d at 447 (quoting *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp.2d 618, 623 (N.D. Tex. 1998)).  Defendants only address Plaintiffs' allegations regarding motive.

---

[3] Plaintiffs also allege that the Mitcham Defendants had opportunity as follows:

116.    The Individual Defendants had the *opportunity* to commit and participate in the fraud.  The Individual Defendants were the top officers and directors of Mitcham and had daily contact as "hand-on" managers dealing with the most important issues facing Mitcham such as it allowance for doubtful accounts and the relative importance of equipment sales to the bottom line.  They controlled its press releases, corporate reports, SEC filings, and its communications with analysts.  thus, the Individual Defendants controlled the public dissemination of, and could falsify, the information about Mitcham's business, products, financial results and future prospects that reached the public and impacted the price of its stock.  they were also in a position to collectively authorize secondary public offerings, through which they could personally sell off thousands of their own shares, thereby generating tremendous proceeds.

(Complaint, Instrument No. 27 ¶ 116) (emphasis added).

26

"Allegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite 'motive' for a scienter allegation." *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1312 (S.D. Cal. 1996). "Only unusual insider trading activity during the class period permits an inference of scienter." *Coates*, 26 F. Supp. at 920. This "requires a showing that the trading was 'in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed information.'" *Marksman*, 927 F. Supp. at 1312 (quoting *Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598, 605 & n.1 (N.D. Cal. 1991)).

"Insider trading in suspicious amounts or at suspicious times, is, of course, presumptively probative of bad faith scienter." *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994). "Where a corporate insider sells only a small fraction of his . . . shares in the corporation, the inference of scienter is weakened." *Marksman*, 927 F. Supp. at 1312. However, "[t]wenty percent of a corporate insider's shares, especially where the dollar amounts are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation." *Id.* at 1313.

According to Plaintiffs, "Billy Mitcham and Rios sold 155,000 and 10,350 shares of Mitcham stock respectively for the total proceeds of more than $3.1 million." (Plaintiffs' Response, Instrument No. 45, at 18). In addition, Plaintiffs continue, "[t]hese sales represented *35% of Billy Mitcham's holdings and 33% of Rios's holdings*. These insider trading proceeds were obtained while Mitcham's stock was trading at inflated prices due to defendants' accounting fraud and false representations." (*Id.* at 18-19 (emphasis added);

27

)

Complaint, Instrument No. 27, ¶¶ 52, 53, 102).  Billy Mitcham sold his stock between $19.00 and $19.56 per share and Rios sold his stock at $19.38 per share.  (Complaint, Instrument No. 27, ¶¶ 52 and 53).  After the company disclosed, on March 26, 1998, that it would not meet its analysts' estimates for the fourth quarter, the stock price dropped from $16.75 per share on March 25, 1998 to $13.00 per share on March 26, 1998.  (*Id.* ¶¶ 80-82).

Given the suspicious amounts of insider trading, namely, the volume of traded stock and the percentage of their holdings, and the allegation that Billy Mitcham and Rios sold their shares while issuing favorable, yet false, statements about Mitcham, the Court concludes that the Mitcham Defendants' fail to show that Plaintiffs have not sufficiently plead motive as a matter of law.

## D.

In general, the Mitcham Defendants argue that Plaintiffs' accounting fraud allegations are insufficient as a matter of law.  They specifically challenge Plaintiffs' allegations of improper revenue recognition and inadequate allowance for doubtful accounts.

"To adequately state a claim for accounting fraud, a plaintiff must plead facts sufficient to support a conclusion that the defendants prepared fraudulent financial statements and that the alleged financial fraud was material." *Zeid v. Kimberley*, 973 F. Supp. 910, 922 (N.D. Cal. 1997).

## 1.

First, Plaintiffs allege that, in violation of GAAP, Mitcham reported materially inflated revenues and earnings in its financial statements filed with the SEC.  (Complaint, Instrument No. 27, ¶ 84).  According to Plaintiffs, "the Mitcham Defendants engaged in shenanigans

28

)

whereby they misclassified equipment 'operating leases' as 'sales-type leases[]' in order to falsely overstate revenues and earnings during the class period.  *(Id.* ¶ 85).

"'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.  The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information.'" *Lovelace v. Software Spectrum inc.*, 78 F.3d 1015, 1020 (5th Cir. 1996) (quoting *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)).  Furthermore, a plaintiff should plead the "'who, what, when , where, and how' that would suggest fraud, rather than a business mistake viewed with the benefit of hindsight." *Cooper v. Pickett*, 137 F.2d 616, 627 (9th Cir. 1997).

Plaintiffs allege that "Mitcham knowingly or recklessly ignored the [mentioned] accounting requirements and instead classified operating leases as sale-type leases even when it did not have a commitment by the customers to accept and pay for the equipment other than as an operating lease." (Complaint, Instrument No. 27, ¶ 89).  Plaintiffs even indicate the "what" (improper revenue recognition), the "when" (2Q98 and 3Q98), the "where" (reported in the Mitcham's financial statements), and "how" (misclassifying leases and improperly recognizing revenues).

However, Plaintiffs' complaint does not adequately state the "who."  There is no specific identification of any individuals or entities that were implicated in Mitcham's allegedly improper recognition of revenues.  In their responsive brief, Plaintiffs simply state that the "who" includes Mitcham's customers who entered into the misclassified operating lease contracts. (Plaintiffs' Response, Instrument No. 45, at 10).  Plaintiffs do not identify particular

29

transactions underlying the Mitcham Defendants' alleged accounting deficiencies. *See Zeid*, 973 F. Supp. at 922. Furthermore, Plaintiffs's complaint of improper revenue recognition is essentially based on the Mitcham Defendants' purported failure to follow GAAP, and nothing more.

The Court, therefore, finds that Plaintiffs have not alleged specific facts sufficient to indicate that the Mitcham Defendants' consciously published materially false information. The Mitcham Defendants' motion to dismiss Plaintiffs' accounting fraud claim based on the improper recognition of revenue is **GRANTED**.

### 2.

Plaintiffs also claim that the Mitcham Defendants' statements and financial disclosures regarding the adequacy of Mitcham's doubtful account allowance and expense were materially false and misleading because they did not adequately reflect Mitcham's true financial position. (*See* Complaint, Instrument No. 27, ¶¶ 39, 41, 50-51, 57, 60, 64-65, 73-74). In particular, Plaintiffs insist that the Mitcham Defendants' knew or recklessly disregarded that Grant owed Mitcham between $2.5 million and $2.4 million and was bankrupt, that between $1.2 million and $3.1 million of trade receivables was 90 days or more past due; and that Mitcham's historic average collection period was 60-90 days. (*See id.*; Plaintiffs' Response, Instrument No. 45, at 11).

Unlike Plaintiffs' allegations regarding the improper recognition of revenue, the Mitcham Defendants' do not establish that Plaintiffs' contentions of inadequate doubtful accounts allowance and expense are insufficient as a matter of law. Plaintiffs identify the "who" (Grant), the "what" (insufficient doubtful accounts allowance and expense), the "when"

30

)

(including 1Q97, 2Q97, amended 2Q97, and 3Q97, etc.), and the "where" (reported in the Mitcham's financial statements). The Complaint alleges that the Mitcham Defendants misled by maintaining inadequate reserves ("how") for the purpose of artificially inflating the price of the Mitcham stock. (Complaint, Instrument No. 27, ¶ 79). Thus, Plaintiffs explain factually why the inadequate reserves were fraudulent. "Overall, the [C]omplaint 'identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer.'" *Cooper*, 137 F.3d at 627 (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996) (quotations omitted)). The Plaintiffs have alleged facts sufficient to warrant consideration of the adequacy of the doubtful accounts allowance and expense at summary judgment or trial. *See Cooper*, 137 F.2d at 627.

### E.

The Mitcham Defendants claim that Plaintiffs improperly attempt to hold them liable for statements made by their analysts, namely those statements contained in paragraphs 77 and 78 of the Complaint.

> "[C]orporate defendants may be directly liable for under 10b-5 for providing false or misleading information to their party securities analysts." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). Securities fraud defendants "cannot escape liability simply because [they] carried out [the] alleged fraud through the public statements of third parties." *Warshaw*, 74 F.3d at 959.

*Robertson*, 32 F. Supp.2d at 450. However, in this case, Plaintiffs fail to identify exactly which defendant made the misrepresentations to Defendant Jefferies and Gaines, the content of the misrepresentations, or the date they were made. Plaintiffs simply allege that Defendants Gaines's and Jefferies's analyst reports were "based on . . . repeated specific representations

31

)

provided to the . . . analyst by the Mitcham Defendants." (Complaint, Instrument No. 27, ¶¶ 77 and 78). As discussed above, these allegations are insufficient under the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994); *Coates*, 26 F. Supp.2d at 914; *Robertson*, 32 F. Supp.2d at 450 (denying the defendants' motion to dismiss the analysts' statement where the plaintiff's identified specific defendants who communicated false statements directly to the analysts in order to use them as conduits to the securities market). The Mitcham Defendants' motion to dismiss Plaintiffs' claims under Section 10(b) and Rule 10b-5 based on the analysts' statements in paragraphs 77 and 78 is **GRANTED**.

### F.

Lastly, with respect to Plaintiffs' claims under Section 10(b) and Rule 10b-5, the Mitcham Defendants argue that Plaintiffs cannot establish loss causation. "To plead loss causation, a plaintiff can allege that he would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss." *Coates*, 26 F. Supp.2d at 922. Furthermore,

> [t]o avoid dismissal for failure to allege causation, Plaintiffs need only allege "facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss."

*Robertson*, 32 F. Supp.2d at 449 (quoting *Zuckerman*, 4 F. Supp.2d at 626). "After examining the [C]omplaint's allegations concerning loss causation, the Court determines that Plaintiffs have alleged causation sufficiently to put Defendants on notice of the charges against them and

32

)

thereby avoid dismissal." *Zuckerman,* 4 F. Supp. at 626; *see Robertson,* 32 F. Supp.2d at 449;

*Coates,* 26 F. Supp.2d at 922; (*See* Complaint, ¶¶ 35-79, 82, 84-101, 124).  Thus, "[w]hether

Plaintiffs can prove their allegations of loss causation, the true issues on which [the Mitcham

Defendants] here attempt to dismiss Plaintiffs' claims, is not an appropriate inquiry on a

motion to dismiss." *Zuckerman,* 4 F. Supp. at 626.

## V.

Next, the Mitcham Defendants maintain that Plaintiffs make no showing of control

person liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act

against the individual defendants, Billy Mitcham and Rios.  "To establish a prima facie case

under [S]ection 20(a) [and [Section 15] in the Fifth Circuit, plaintiffs must demonstrate that

the individual participated in or induced the alleged primary violation." *In re Browning,* 876

F. Supp. at 911 (citing *Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509 (5th Cir. 1990));

*Pharo v. Smith,* 621 F.2d 656, 673 (5th Cir. 1980), *on reh'g in part,* 625 F.2d 1226 (5th Cir.

1980) ("Section 20(a) is an analogue of [S]ection 15 of the Securities Act.  Therefore, we give

the two sections the same interpretation.").

In *Robertson v. Strassner,* 32 F. Supp.2d 443, 450 (S.D. Tex. 1998), the court

examined whether the plaintiffs had sufficiently plead a cause of action against the individual

defendants under Section 20(a).  The court noted that the plaintiffs had alleged that the

individual defendants had actual power or influence over the company and had the ability to

control corporate policy.  *Id.*  The Court held that these "allegations satisf[ied] [the]

[p]laintiffs' pleading requirements under Section 20(a)." *Id.*

33

Likewise, in this case, Plaintiffs' allegations of control person liability under Section

20(a) and Section 15 are sufficient.  In their Complaint, Plaintiffs state the following:

> 15.    (a) Defendant Billy F. Mitcham, Jr. . . . was . . . Chairman, President, and Chief Executive Officer of the Company. . . .
> (b)    Defendant Roberto Rios . . . was . . . Vice President-Financial and Chief Executive Officer of Mitcham. . . .
>
> 16.    . . . . Because of these Individual Defendants' *positions with the Company*, they each had access to the adverse non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents . . . , conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. . . .
>
> 17.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed *the power and authority to control the contents of the Registration Statement and Prospectus* pursuant to the Offering and its quarterly and annual reports . . . .
>
> . . . .
>
> 126.    Defendants Billy Mitcham and Rios acted as . . . controlling persons of Mitcham within the meaning of §20(a) of the Exchange Act.  *By reason of their positions at Mitcham they had the power and authority to cause Mitcham to engage in the wrongful conduct complained of herein.* . . .

(Complaint, Instrument No. 27, ¶¶ 16-17, and 126) (emphasis added).  Similar allegations are

made in support of Plaintiffs' claims under Section 15.  (*Id.* ¶ 112).

Thus, at this stage of the pleadings, Plaintiffs' allegations of control person liability are

sufficient to survive the Mitcham Defendants' motion to dismiss.  *See Robertson*, 32 F. Supp.

at 450; *In re Browning*, 876 F. Supp. at 911 (noting that allegations that individual defendants

were officers and directors of the company or that they may have signed various public

)

documents may be sufficient "to establish a presumption of participation in the fraud may be sufficient to plead a [S]ection 12(A) violation or to survive a motion to dismiss").

## VI.

Lastly, the Mitcham Defendants contend that Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act, which are limited to the Prospectus filed in connection with Mitcham's December 17, 1997 secondary offering, are deficient as a matter of law. In particular, the Mitcham Defendants assert that Plaintiffs lack standing to bring these claims.

"Section 11 provides that any signer, officer, of the issuer, or underwriter may be held liable for a registration statement that contains an untrue statement of a material fact or omits a material fact." *Gould v. Harris*, 929 F. Supp. 353, 358 (C.D. Cal. 1996). Section 12(a)(2) "grants purchasers an express cause of action for rescission, or for damages if they no longer own the securities, against those who sell securities 'by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made not misleading . . . ." *Gould*, 929 F. Supp. at 358 (quoting 15 U.S.C. § 77*l*(a)(2)).[4] Section 12(a)(2) also provides that the seller of the securities shall be liable only to the person who purchases such securities from him. 15 U.S.C. § 77*l*(a)(2).

---

[4]Prior to the passage of the Reform Act, Section 12(a)(2) of the Securities Act was designated as Section 12(2) or 15 U.S.C. § 77*l*(2).

In *Gustafson v. Allyod Co.*, 115 S. Ct. 1061, 1071 (1995), the Supreme Court held that "the intent of Congress and the design of the statute require that . . . [Section] 12[a](2) liability be limited to public offerings."  The Court stated the following:

> It is understandable that Congress would provide buyers with a right to rescind, without proof of fraud or reliance, as to misstatements contained in a document prepared with care, following well-established procedures relating to investigations with due diligence and *in the context of a public offering by an issuer and its controlling shareholders*.  It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market.  It is often difficult, if not altogether impractical, for those engaged in casual communications not to omit some fact that would, if included, qualify the accuracy of the statement.

*Id.* (emphasis added).  Since this decision, district courts have held that Section 12(a)(2) applies only to the distribution of securities by an issuer or controlling shareholder in public offerings, not secondary private ones.  *See In re Summit Medical Sys., Inc., Sec. Litig.*, 10 F. Supp.2d 1068, 1070 (D. Minn. 1998)*; Gould*, 929 F. Supp. at 358; *Warden v. Crown American Realty Trust*, No. Civ.A.-96-25J, 1998 WL 725946, *2 (W.D. Pa. Oct. 15, 1998) (unpublished decision); *In re WRT Energy Sec. Litig.*, No.-96-3610, 1997 WL 576023, *5-6 (S.D.N.Y. Sept. 1997) (unpublished opinion); *In re Valence Tech. Sec. Litig.*, 1996 WL 37788, *4 (N.D. Cal. Jan. 23, 1996) (unpublished decision); *Glamorgan Coal Corp. v. Ratner's Group PLC*, 1995 WL 406167, *2 (S.D.N.Y. 1995) (unpublished decision) (listing cases).  Thus,

> in order to hold a seller of a security liable under [S]ection 12, a buyer must have purchased a security that was issued in a public offering (under *Gustafson*) and have purchased it "directly from" the seller (under the plain language of the statute).  When one considers these two limitations in combination, it becomes clear that the only plaintiffs who have standing to sue under [S]ection 12 are those who have purchased their shares directly from a seller in a public offering.

36

*In re Fine Host Corp. Sec. Litig.*, 25 F. Supp.2d 61, 67 (D. Conn. 1998); *see Schwartz v. Central Seasoning, Inc.*, 178 F.R.D. 545, 555 (D. Colo. 1998) ("[A]lthough *Gustafson* did not address the issue of standing under . . . [Section] 12[a](2), it is understandable that the holding could be expanded to require . . . [Section] 12[a](2) claimants to have purchased their securities in a public offering . . . rather than in an aftermarket transaction.").

Although *Gustafson* did not directly address whether Section 11 claimants, like Section 12(a)(2) claimants, must have purchased their shares in a public offering in order to have standing, this Court finds that the reasoning in *Gustafson* applies to Section 11 claims as well. Section 12(a)(2) and Section 11 share the same legislative history. *In re Summit*, 10 F. Supp.2d at 1070; *Gould*, 353, F. Supp. at 358. "That history provides that the 1933 Act only governs 'new offerings,' rather than ordinary distributions of securities." *In re Summit*, 10 F. Supp.2d at 1070. Furthermore, "since a plaintiff in a Section 11 or 12 action can recover 'without proof of wither fraud or reliance,' it is improbable that 'Congress would have extended that liability to every private or secondary sale without a whisper or an explanation.'" *Id.* (quoting *Gustafson*, 513 U.S. at 580)). Thus, "[t]he Gustafson reasoning is equally applicable to claims arising under [S]ection 11." *Gould*, 929 F. Supp. at 358; *In re Summit*, 10 F. Supp.2d at 1070; *In re WRT Energy Sec. Litig.*, No.-96-3610, 1997 WL 576023, *6 (S.D.N.Y. Sept. 1997) (unpublished opinion). As such, Plaintiffs must establish that they purchased Mitcham securities during the public offering.

In this case, Plaintiffs do not even mention whether Plaintiffs Maniag, Stansfeld, Ramseur or any other plaintiffs in the class purchased stocks in the public offering. Therefore, the Court finds that these plaintiffs, who apparently did not purchase any stock in the public

37

offering, lack standing to assert a claim under Section 11 and Section 12(a)(2).  The Mitcham Defendants' motion to dismiss these claims is **GRANTED**.

Plaintiffs, however, do allege that Plaintiffs Moskowitz, Hammond, and Finkelstein "purchased shares of Mitcham stock *on the Offering*, which shares were issued and sold in the Offering and are traceable to the December 17, 1997 Registration Statement and Prospectus[.]"  (Complaint, Instrument No. 27, ¶¶ 12-13) (emphasis added).  The Court finds that these allegations are insufficient to establish that these plaintiffs purchased securities in the public offering and not in a secondary private one.  Plaintiffs do not complain that they purchased their Mitcham shares *in the public offering*, but rather *on the offering*. Furthermore, "neither [S]ection 11 nor [S]ection 12 extends to securities purchases that are merely 'traceable' to the offering.  Under *Gustafson*, [S]ections 11 and 12[a](2) apply only to purchases made in the initial offering and not to those purchased in the secondary market." *Gould*, 929 F. Supp. at 359; *In re Valence Tech. Sec. Litig.*, 1996 WL 37788, *4 (N.D. Cal. Jan. 23, 1996) ("The language in Gustafson makes irrelevant whether the transaction is 'traceable' to a public offering.").

Because Plaintiffs Moskowitz, Hammond, and Finkelstein do not allege that they purchased their Mitcham securities in the public offering, the Court **DISMISSES** without prejudice Plaintiffs Moskowitz's, Hammond's, and Finkelstein's claims under Section 11 and Section 12(a)(2).  Plaintiffs Moskowitz, Hammond, and Finkelstein are granted leave to replead these claims to allege (if it is the case) that they purchased their securities in the offering itself as opposed to on the secondary market.

**VI.**

38

Accordingly, the Mitcham Defendants' Motion to Dismiss is **GRANTED in PART** and **DENIED in PART**. (Instrument No. 37). In particular, the Mitcham Defendants' motion with respect to Plaintiffs Moskowitz's, Hammond's, and Finkelstein's claims under Section 11 and Section 12(a)(2) is **DENIED** without prejudice to re-urge after Plaintiffs file an amended complaint. Plaintiffs Moskowitz, Hammond, and Finkelstein are granted leave to replead their Section 11 and Section 12(a)(2) claims, provided they are able to cure the above-noted defect. Plaintiffs' Motion to Strike the Mitcham Defendants' Exhibits is **DENIED**. (Instrument No. 44). The Mitcham Defendants' Motion is **GRANTED** with respect to Plaintiffs' claims delineated in paragraphs 38, 42 and 45 as they are protected by PSLRA's Safe Harbor Provisions, and as to Plaintiffs' claims for accounting fraud based on the improper recognition of revenue and the analysts' statements in paragraphs 77 and 78.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 28th day of September, 1999, at Houston, Texas.

_VANESSA D. GILMORE_
**UNITED STATES DISTRICT JUDGE**